```
                                              FILED
                                          April 01, 2011
                                    CLERK, U.S. BANKRUPTCY COURT
                                    EASTERN DISTRICT OF CALIFORNIA
                                            0003393381
```

1  BRAD A. MOKRI, ESQ., SBN: 208213
   LAW OFFICES OF MOKRI & ASSOCIATES
2  1851 E. First Street, Suite 900
   Santa Ana, California 92705
3  Telephone No.: (714) 619-9395
   Facsimile No.: (714) 619-9396
4
5  Attorney for Plaintiff HERITAGE PACIFIC FINANCIAL LLC dba
   HERITAGE PACIFIC FINANCIAL

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br>MIGUEL ARREDONDO<br>1201 Allen Street<br>Modesto, CA 95350<br><br>            Debtor.<br>HERITAGE PACIFIC FINANCIAL, LLC.,<br>doing business as HERITAGE PACIFIC<br>FINANCIAL,<br><br>            Plaintiff,<br><br>vs.<br><br>MIGUEL ARREDONDO,<br><br>            Defendant | Chapter 7<br>Bankruptcy No. 10-92234-E-7<br><br>Adversary Case No.: 10-09065-E<br><br>**DECLARATION OF MARK SCHUERMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Notice of Motion and Motion; Statement of Uncontroverted Facts and Conclusions of Law; Declarations of Ben Ganter and Brad A. Mokri; and [Proposed] Judgment filed concurrently herewith]<br><br>[F.R.C.P. 56 & F.R.B.P. 7056]<br><br>DATE: May 18, 2011<br>TIME: 10:30 a.m.<br>PLACE: United States Bankruptcy Court<br>          1200 "I" St., (2nd Floor), Suite 4<br>          Modesto, California |

---

DECLARATION OF MARK SCHUERMAN

-1

I, Mark Schuerman, declare as follows:

1. I have personal knowledge of the matters stated herein, and if I were called as a witness, I would competently testify to the matters stated herein. I have been retained as an expert in this matter for Plaintiff Heritage Pacific, LLC dba Heritage Pacific Financial and have reviewed the adversary complaint, the 1003 Application, promissory note and Plaintiff's Motion for Summary Judgment.

2. I am an MCS Associates consulting expert. I am broadly experienced in real estate lender and mortgage banking, and have served as a banking executive for thirty (30) years in loan origination, sales, administration and top management positions in the home equity and 2nd TD real estate lending industry. I have substantial experience in the establishment and management of residential loan production programs, secondary marketing and loan administration/servicing. I am a nationally known leader in the home equity lending industry and have served frequently as a mortgage banking consultant and expert witness on mortgage banking, secondary marketing and loan administration matters.

3. I established and direct American MortgageBanc, a mortgage banker producing and selling residential mortgage loans throughout California, and I am also President of Lenders Survey Services, Inc., a company I founded in 1993, which conducts loan audits and customer surveys to assist lenders in customer service/relationship issues, regulatory compliance and mortgage fraud detection.

4. From 1995 through March 1998, I was President of Royal MortgageBanc, a California-based banking company that Conti Mortgage (a national leader in the home equity lending industry) acquired in 1995.

5. From 1992 to 1995, I was President of Royal Thrift & Loan, where I directed the thrift's lending and funding operations, including all loan origination, underwriting, secondary marketing, loan servicing and loan administration. I also established a new loan origination network of brokers and loan offers in California, Washington and Arizona, originating up to $300 million annually.

**DECLARATION OF MARK SCHUERMAN**
- 2 -

6. From 1986 to 1991, I served as Chief Operating Officer of Long Beach Bank's Residential Lending Division, which I established in 1986 and which I guided in pioneering their role as a sub-prime consumer finance lender originating and placing loans in the secondary markets. I directed the opening and management of a national origination network of loan offices and broker relationships, development of a large centralized secondary marketing, loan servicing and support group, and establishment of policies, procedures, operational and quality controls and systems for an organization with annual production of $1 billion in 1991, with over $1.2 billion in securitized loan sales.

7. During 1980-1985, I directed a mortgage lending program for Anaheim Savings, and was subsequently involved in the reorganization of Glenfed Mortgage's lending operations. I then served as a mortgage banking consultant to mortgage banking organizations with MCS Associates, where I directed and performed production, operations, systems and product/services design and evaluation projects for large and small mortgage banking units of banks, thrifts and independent mortgage bankers.

8. From 1973 to 1980, I held positions in mortgage loan originations with Cameron Brown Company and subsequently as head of 2nd trust deed lending at Advance Mortgage Corp.

9. I hold a MBA degree in Finance and Real Estate from Indiana University, a Bachelor of Science degree in Economics from Miami University (Ohio) and I am a licensed California Real Estate Broker. I serve as a Board Member of the National Home Equity Mortgage Association, and served as the former President of the Inland Empire Mortgage Bankers' Association.

10. This declaration (and the statements contained herein) are made without waiving any attorney-client privilege (as plaintiff's attorney's consultant), work product privilege, or any other privilege which may apply as a result of the attorney's consultation of the plaintiff by the law firm of Mokri & Associates, and is not intended to, and shall not be deemed to, waive any attorney client privilege, work product privilege, or any other privilege which may arise under statute or common law.

11. There are established customs and practices within the mortgage lending industry, when it comes to relying on stated income. At the time these loans are entered into, the lender expects to only hold that note for thirty (30) to ninety (90) days before selling that note to an investor, who then has a successor interest. The buyers of these notes rely on the stated income and representations made in the 1003 Applications when purchasing these notes from the original lenders.

12. I have examined the 1003 Applications that Plaintiff relies on. This 1003 Application, otherwise called a "Uniform Residential Loan Application" is used by all lenders in the industry. Paragraph IX, "Acknowledgement and Agreement" states:

> **"Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application...."**

Paragraph IX, "Acknowledgement and Agreement" further states:

> **"...(6) the Lender, its servicers, successors or assigns may rely on this information contained in the application..."**

This paragraph is included in every 1003 Application and is heavily relied upon in the industry by lenders and successors in interest. This clause is a crucial aspect of the mortgage lending industry. It is my professional opinion that without this clause and the established practices and procedures accompanied it; the industry would not have functioned. If changed, the industry would cease to exist. There would be no incentive for a secondary market investor to purchase these notes, as the risk would be too great for the associated financial reward.

13. Plaintiff operates in the secondary mortgage market. When purchasing loans on the secondary market, Plaintiff relies only on the information provided on the loan application and the stated income, which is typical in the mortgage industry. The secondary market is highly

negotiable and any fraudulent misrepresentations of material facts contained in a 1003 Application would have a greater adverse effect on a second trust deed holder than on a first trust deed holder because the second trust deed holder is essentially at the mercy of the first trust deed holder. The second trust deed holder therefore heavily relies on the stated income, employment, assets and debts of the borrower in the 1003 Application so that in the event of foreclosure by the senior lienor, the borrower is still capable of paying on the second trust deed note.

14. By signing the "Acknowledgement and Agreement" clause each borrower is representing to not only the original lender, but all subsequent owners of the note, that the information contain within the 1003 Application is true. By signing this acknowledgement, the borrower is intending that not only the original lender rely of the information contained in the application, but that all successors in interest and assigns also rely on this information.

15. It is my professional opinion that if more direct lenders and secondary market investors sought to enforce this clause, it would deter applicants from providing false information, and only those who were truly within their means would be approved.

16. After reviewing this case, it is clear that a second deed of trust was extended to Defendant ARREDONDO to secure payment of part of the purchase price of real property. It is my professional opinion that when a junior lienholder holds a second deed of trust, that junior lienholder is not protected upon foreclosure under the sale powers contained within the first deed of trust.

17. When a senior lienholder forecloses on a property, that selling senior can bid at the sale in an amount equal to his claim against the debtor or the fair market value, whichever is less. A senior need not expend or invest any additional funds to do so. By contrast, a junior lienholder would have to invest additional funds to redeem or buy in at the sale. The property securing the second deed of trust upon foreclosure by the senior lienholder is thereby rendered valueless and the only recourse available to the junior lienholder is to bring an action to recover the debt; or as is the case here to sue based upon fraud where the borrower has misrepresented material facts in the 1003 Application.

I declare under penalty of perjury that the foregoing is true and correct or my professional opinion and this declaration was executed under the law of the State of California and the United States of America.

DATED: March 28, 2011.

Declarant, Mark G. Schuerman

---

**DECLARATION OF MARK SCHUERMAN**

-6